Filed 2/10/17

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KHARY WATSON,<br><br>    Defendant and Appellant. | D069324<br><br><br><br>(Super. Ct. Nos. SCD215231,<br>  HC20480) |

APPEAL from a judgment of the Superior Court of San Diego County, Kerry Wells, Judge. Affirmed.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Theodore M. Cropley and Kelley Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

Khary Watson challenges his sentence of life without the possibility of parole (LWOP) for committing felony murder when he was only four months shy of his 18th birthday. Watson's offense occurred after he chased down a woman who tried to run

away while Watson was robbing her. Watson shot her in the back. He now contends his sentence violates the Eighth Amendment of the United States Constitution. He also maintains California's sentencing scheme as well as specific Penal Code provisions violate the equal protection and due process clauses of the United States Constitution. We conclude Watson's arguments lack merit; thus, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

To provide the necessary context for the issues Watson raises here, we repeat the factual background verbatim from Watson's previous appeal of his judgment convicting him of felony murder. (See *People v. Watson* (July 20, 2011, D056848) [nonpub. opn.], review denied Oct. 26, 2011, S195873.)

"In October 1994, Patricia Lopez was fatally shot during a street robbery. The murder remained unsolved until after 2006, when the police received an anonymous phone call which led them to information concerning the persons involved in the crimes. The authorities identified the suspects as two males (defendant and Tyrone Katrel Lynch) and a female (Komoa Greene). Lynch eventually identified defendant as the shooter, entered into a plea agreement, and agreed to testify.

"In addition to Lynch, several eyewitnesses to the shooting testified at trial, including Lopez's friend (Barbara Nickerson) and Nickerson's son (Paul). Nickerson was with Lopez at the time of the shooting. At about 10:00 p.m. on October 1, 1994, the two women were walking to Lopez's apartment when a man came out of the bushes, pointed a gun at Nickerson, and told Nickerson to remove her fanny pack. Nickerson unbuckled and dropped her fanny pack, and the man picked it up from the ground. Nickerson called

2

out to Paul (who was at Lopez's apartment), and Paul came outside. Meanwhile, Lopez was running towards her apartment. The man ran after Lopez, grabbed her, and shot her. While this was occurring, another man was standing in the street waiting for the man with the gun. After Lopez was shot, the other man said, ' "Come on, man. We have to go." ' The two men ran off together. Lopez died at the scene.

"After receiving the anonymous phone call and commencing their investigation, the authorities made contact with Lynch, who was living in Albuquerque, New Mexico. Beginning in February 2008, the police and Lynch had several phone conversations and in-person interviews to discuss the incident. In August 2008, Lynch was arrested for the murder. On August 7, 2008, Lynch was placed in a holding cell with defendant, and while in the cell for several hours Lynch tried to convince defendant to tell the truth about the shooting. Unbeknownst to Lynch and defendant, the conversations were recorded. At one point during the conversations, Lynch, lamenting that he was being charged with murder, asked defendant, 'Why couldn't you just shoot her in the leg or something man.' Defendant did not respond to this statement.

"In May 2009, Lynch reached a plea agreement with the prosecution, pleading guilty to voluntary manslaughter, robbery, and attempted robbery.

"Testifying on behalf of the prosecution at trial, Lynch stated that on the night of the shooting he and defendant (with Greene acting as the driver) committed two street robberies. They committed the first robbery in an alley. Greene then drove them to another location, where defendant and Lynch got out of the car and approached two women (Nickerson and Lopez). Defendant was carrying a gun owned by Greene. When

3

Lynch saw defendant grab one of the women, he got nervous and started looking around. Lynch saw a woman on a balcony, and he kept his eye on her to make sure she did not run into the house to call the police. Lynch heard someone screaming, ' "Stop. Leave me alone. No," ' and then heard a gunshot. Lynch looked back and saw defendant bent towards the ground. Lynch told defendant to 'come on' and they ran back to the car. When they were back in the car, defendant stated that 'he got the shell casing.' Greene asked defendant, ' "Why did you shoot?," ' and defendant responded, ' "Because the bitch bit me." '

"Dominic Holmes, a friend of defendant and Lynch, testified that defendant talked to him about the shooting. Holmes testified that defendant stated that he, Lynch, and Greene were 'out taking purses' and that he shot '[s]ome bitch.'

"The jury found defendant guilty of first degree murder with personal use of a firearm and with the special circumstance of murder during the commission or attempted commission of robbery. He was sentenced to life without the possibility of parole."

Watson appealed the judgment following the jury's guilty verdict, and this court affirmed the judgment in an unpublished decision.

In his third petition for a writ of habeas corpus, Watson claimed his LWOP sentence violated the Eighth Amendment as well as *Miller v. Alabama* (2012) 567 U.S. ____, [132 S.Ct. 2455] (*Miller*) and *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*). An order to show cause was issued.

The People conceded that Watson was entitled to a new sentencing hearing.

The superior court subsequently granted the requested relief in part and ordered a new sentencing hearing under Penal Code section 190.5, subdivision (b)[1] as well as *Miller, supra,* 132 S.Ct. 2455 and *Gutierrez, supra,* 58 Cal.4th 1354.[2]

The same superior court judge who presided over Watson's trial and sentencing after that trial handled Watson's resentencing hearing. As an initial matter, the judge informed the parties that she had erred in sentencing Watson under section 190.2, subdivision (a)(17) instead of section 190.5, subdivision (b) because he was 17 years old at the time he committed the subject crime. In addition, the judge indicated, to prepare for the hearing, she read the People's sentencing memorandum, Watson's statement in mitigation, Watson's motion to apply *Miller, supra,* 132 S.Ct. 2455 and *Gutierrez, supra,* 58 Cal.4th 1354 retroactively, her notes from the trial, and several of the cases cited by the parties, including *Miller* and *Gutierrez.*

The judge then proceeded to conduct an extremely thorough resentencing hearing. First, two witnesses, Rosemary Ruybal and Paul Nickerson, addressed the court. Ruybal, the victim's daughter, spoke of how painful the ordeal of her mother's murder had been for her family. She explained that she did not know why her mother was killed until she learned that Watson decided to kill Lopez "because, quote, 'the bitch bit me.' " Ruybal was particularly troubled by Watson's lack of remorse: "That is what bangs around in my

---

[1]    Statutory references are to the Penal Code unless otherwise specified.

[2]    Watson was sentenced before the United States Supreme Court issued its opinion in *Miller*, *supra*, 132 S.Ct. 2455.

5

brain on a regular basis. Fifteen years after he gunned her down, that's his explanation. No remorse, no compassion. Just like that."

Nickerson, who observed Watson chasing and killing Lopez, expressed his sadness and anger that Watson killed the victim "over a petty crime of theft" and stated that Watson had destroyed Nickerson's family's life and the victim's family's life.

Next, the People offered argument regarding various factors under *Miller*, *supra*, 132 S.Ct. 2455 and *Gutierrez*, *supra*, 58 Cal.4th 1354 supporting their position that an LWOP sentence was appropriate for Watson. Watson's attorney countered, asserting Watson should not receive an LWOP sentence under the same factors.

Finally, Watson addressed the court, stating he was "deeply remorseful" for his action and for the victim's family's losses. He asked the court for the opportunity to redeem himself and receive a lesser sentence.

The court then considered the relevant factors and rendered its opinion. Because the court so thoroughly discussed the matter, we take the unusual step of including in this opinion much of the court's discussion at the resentencing hearing:

> "In looking at the factors that the courts -- Miller and Gutierrez has advised the trial courts to consider, I want to go through each of these. The first one is chronological age and hallmark features of youth.
>
> "As noted, the defendant in this case at the time of the murder was 17 years and eight months. He was four months shy of 18, of full adulthood, and it does sometimes strike me as not appropriate to have that line that somebody becomes an adult and fully culpable at age 18 but not at 17 years and 11 months, because I happen to know some eighteen-year-olds that are pretty immature and some sixteen-year-olds that I think are pretty mature.

"But be that as it may, it is clear that Mr. Watson was very close to full adulthood chronologically.

"There's an argument that's been made that he, Mr. Watson, was subject to the pressures of his cohorts that night, and, quite frankly, I don't think the evidence supports that. Mr. Katrel Lynch was 18 years old, the defendant was 17 years old, Ms. Greene was 22 years old. And the evidence is that they had all been friends for a long time, particularly Katrel and the defendant. They grew up together; they had been friends for a long time.

"There was no suggestion that any of them were particularly exerting power or pressure over any of the others. In fact, it seems that all three of them were simply equal partners that night in initially discussing the robbery.

"It was the defendant who recommended that they go out and rob Mexicans because they keep their money on them, and apparently, it was maybe payday. There is no question that it was the defendant who took the gun into his possession and used the gun. First, in the separate robbery, he had the gun and committed robbery against that victim, and you have to think that he had to have seen the fear that that victim went through when she had a gun pointed at her and was being armed -- robbed, and that, of course, didn't deter the defendant at all.

"The circumstances of shooting Ms. Lopez are just really quite horrifying that this 50-some-odd-year woman was attempting to run away and that the defendant chased her down -- rather than just letting her go, chased her down and put the gun in her back and just blew her away while other people are standing around. It's pretty amazing that one human being can do that to another.

"And with respect to whether there's evidence of this being a youthful crime or an adult crime, there was actually a fair degree of sophistication shown by Mr. Watson when he took the time, had the presence of mind to stop -- rather than just fleeing in horror at what he had done, he took the time to stop and collect the shell casing off the ground, knowing that it could be used as evidence against him. That simply does not show youthful impetuousness. It shows sophisticated criminal activity.

7

"With respect to the second factor, his family and home environment, I really have little to go on regarding that. There are statements regarding having some disability and mental illness, but nothing to really substantiate that by way of an evaluation or report in the past, nothing to substantiate or -- I just have really very little information regarding the defendant's background and upbringing.

"I don't doubt that he may be illiterate, that he apparently dropped out of school at the 10th grade, but, unfortunately, I don't have much more to go on to help explain why the defendant would have been in the position he was in when he was 17 years old and out committing indiscriminate robberies, just looking for victims on the street.

"The third factor, the defendant's participation in the crime, I think I've already kind of talked about that. I note that one of the quotes in Miller when they're talking about the extent of the juvenile's participation, they say 'a juvenile offender who did not kill or intend to kill has certainly a diminished moral culpability.'

"Of course, in this case, the defendant did kill and he did clearly intend to kill, suggesting the opposite: a real moral culpability for what occurred here. He wasn't just an accomplice or an aider and abetter but got caught up in a group of young men out causing havoc.

"The other factor in this one is whether or not substance abuse played a role in the commission of the crime, and there's no evidence that it did or that he had a history of substance abuse problems although there may have been some substance use.

"The fourth factor, whether the defendant might have been charged or convicted of a lesser offense if not for the incompetencies associated with youth, and what the court is talking about there is they state, 'For example, his inability to deal with police officers or prosecutors, including on a plea agreement or his incapacity to assist his own attorneys.'

"So they're talking about a circumstance where he's 17 and having to deal with law enforcement on his own or having to deal with the criminal justice system at 17, certainly not having the sophistication of an adult to know how to protect his rights.

8

"And, of course, and I think [the People] made this point: this is really not relevant in this case because the defendant wasn't arrested or contacted by law enforcement until he was 32 years old, and he certainly at that time had a significant degree of sophistication with the criminal justice system having been convicted on numerous times and having been to prison on numerous times, so I don't think that factor applies.

"The fifth factor in the evidence bearing on the possibility of rehabilitation, and this -- I think there are two factors that come into play here: the defendant's criminal record is certainly very relevant. And the specifics of his criminal convictions are listed on the People's sentencing memorandum at page 10, and I won't repeat each one of those. I incorporate those convictions by reference.

"But I do note, as [the People] noted, that just within months, within the next year after committing this murder, the defendant was convicted of a robbery; the next year convicted of a battery; the next year convicted of theft and sent to 16 months in state prison; the next year convicted of arson and sentenced to 32 months in prison;

"The same year convicted of driving under the influence and possession of a controlled substance; the next -- two years later convicted of another theft and sentenced to 32 months in state prison;

"Three years later, convicted of corporal injury on a spouse, sentenced to four years in prison. He was also charged in that case with assault with a deadly weapon, criminal threats, and willful cruelty to a child; and then, finally, shortly before his arrest in this case, possession of a switchblade.

"That's an incredible record, it's a record that just went unabated after having committed this murder and probably feeling like he'd gotten away with it.

"There were two choices that he had obviously after committing this murder: one was to realize, 'My goodness. Look what I did. This is horrible. I can't even believe that I had done that' and realize that it was time to make a change and seek help and do something about his life. That was one choice. He obviously took the other choice.

9

"The defendant's record -- juvenile record is also relevant. It's interesting. When you look at his juvenile record, he actually starts out in 1988 committing what I would consider a juvenile crime, and that's what we're looking at here. Is this a juvenile crime or an adult crime? He started off by shoplifting watches from Nordstrom. That's a juvenile crime, in my opinion. The next crime was he stole a bicycle from a backyard. That's a juvenile crime.

"But then he very quickly started escalating and he robbed another minor of a bicycle by punching him in the face; then he started committing residential burglaries, then he stole a moped; and when he was placed in the San Diego House of Hope, he went AWOL. He was placed in another residential group home and he went AWOL. He then stole a car, placed in a residential treatment facility and he went AWOL.

"There were -- as a juvenile, appears to have been numerous attempts to get him help, to get him on the straight and narrow, and for whatever reason, he did not avail himself of that.

"So in summary, how I see this, I don't think, first of all, that anyone would disagree that this was a vicious, cold-blooded, senseless murder of a mother and grandmother -- vulnerable, mother and grandmother that netted -- in my notes it was only 15 cents. I may have gotten that wrong, but certainly netted only cents.

"The evidence does not support in any way that this was impetuous. The very nature of the planned and premeditated armed robberies of innocent women on the street hardly suggests that the crimes were youthful in nature. They were very adult crimes; they were committed in a very adult way.

"The lack of remorse and taking responsibility for the crime, I have in my notes that that's very disturbing to me. It appears that Mr. Watson has expressed some remorse today, but this is the first time. He has never expressed that before.

"In fact, he clearly -- the evidence was that he bragged about this killing, even perhaps joked about it, immediately after, and as well later when he had matured after, you know, the 12 years of being out there committing crimes and ultimately being prosecuted for this case, there was not a word through probation, through counsel,

10

through himself, through anyone of remorse or having realized the gravity of what he had done.

"When you look at the record, I think it's very sad, but the juvenile record itself suggests that by the time he committed this murder, he had already become a hardened criminal and was showing absolutely no regard for the rest of society. And certainly the 12 years following this murder, which showed serious felony crimes just about every year thereafter, only confirms that one, he is a danger to society, and the pattern of criminality that began as a juvenile was well ingrained by the time he was sentenced on this case.

"There may be some mitigation regarding his background. I suspect that even without a whole lot of information that he had a tough childhood, and who knows what would have happened if he'd been raised by a loving and concerned family, but those factors, somewhat vague as they are, simply don't outweigh the rest of the circumstances of this crime.

"And the quote I think that you both have cited from <u>Miller</u> is, 'This court is to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity and the rare juvenile offender whose crime reflects irreparable corruption,' and I just find that this is that rare case. I sentence the defendant to life in prison without the possibility of parole."

Watson timely appealed.

## DISCUSSION

## I

### *WATSON'S EIGHTH AMENDMENT CHALLENGE*

Watson argues his sentence of LWOP violates the Eighth Amendment because it amounts to cruel and unusual punishment. We disagree.

### A. The Law

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." This

11

constitutional provision "guarantees individuals the right not to be subjected to excessive sanctions."  (*Roper v. Simmons* (2005) 543 U.S. 551, 560 (*Roper*).)  This right "flows from the basic ' "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." ' "  (*Ibid.*)  To determine whether a punishment is cruel and unusual, and thus violative of the Eighth Amendment, "courts must look beyond historical conceptions to ' "the evolving standards of decency that mark the progress of a maturing society." ' "  (*Graham v. Florida* (2010) 560 U.S. 48, 58 (*Graham*).)  "This is because '[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment.  The standard itself remains the same, but its applicability must change as the basic mores of society change.' "  (*Kennedy v. Louisiana* (2008) 554 U.S. 407, 419.)

Over the past several years, the United States Supreme Court has addressed the constitutional limits of punishment for a juvenile's criminal offenses.  In *Roper, supra,* 543 U.S. 551, the United States Supreme Court held the imposition of capital punishment on juvenile offenders for any offense whatsoever violated the Eighth Amendment.  (*Id.* at pp. 578-579.)  The court explained that because juveniles have lessened culpability they are less deserving of the most severe punishments.  (*Id.* at p. 569.)  The court noted that, as compared to adults, juveniles have a " 'lack of maturity and an underdeveloped sense of responsibility' "; they "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and their characters are "not as well formed."  (*Id.* at pp. 569-570.)

In *Graham*, *supra*, 560 U.S. 48, the United States Supreme Court continued to limit the scope of punishment applicable to juvenile offenders. Applying much of the reasoning it found persuasive in *Roper*, *supra*, 543 U.S. 551, the court held that the Eighth Amendment prohibits states from sentencing a juvenile convicted of nonhomicide offenses to LWOP. (*Graham*, *supra*, at p. 75.) In *Graham*, the 16-year-old defendant, Terrance Graham, committed armed burglary and attempted armed robbery, was sentenced to probation, and subsequently violated the terms of his probation when he committed other crimes. (*Id*. at pp. 56-57.) The trial court revoked his probation and sentenced him to life in prison for the burglary. (*Id*. at p. 57.) Graham's sentence amounted to LWOP because Florida had abolished its parole system, leaving Graham with no possibility of release unless he was granted executive clemency. (*Ibid*.)

The Supreme Court stated that nonhomicide crimes differ from homicide crimes in a "moral sense" and that a juvenile nonhomicide offender has a "twice diminished moral culpability" as opposed to an adult convicted of murder--both because of his crime and because of his undeveloped moral sense. (*Graham*, *supra*, 560 U.S. at p. 69.) The court relied on studies showing that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence. [Citations.] Juveniles [also] are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults." (*Id*. at p. 68, quoting *Roper*, *supra*, 543 U.S. at p. 570.) No legitimate

13

penological interest, the court concluded, justifies an LWOP sentence for juvenile nonhomicide offenders. (*Graham, supra,* at pp. 74-75.)

The Supreme Court applied the holding of *Graham*, *supra*, 560 U.S. 48 to homicide crimes, decreeing that the prohibition of cruel and unusual punishment set forth in the Eighth Amendment prohibits the imposition of a mandatory LWOP sentence on a juvenile offender. (*Miller, supra,* 132 S.Ct. at p. 2469.) Citing *Roper*, *supra*, 543 U.S. 551 and *Graham*, the court explained that in homicide cases involving juvenile offenders, the sentencing court is required "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller*, *supra*, at p. 2469, fn. omitted.) The court elaborated:

> "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features-- among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him--and from which he cannot usually extricate himself--no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth--for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys." (*Id*. at p. 2468.)

However, the Supreme Court in *Miller*, *supra*, 132 S.Ct. 2455, made clear that, in homicide cases, it was "not foreclos[ing]" the ability of a sentencing court to impose "this harshest possible penalty" of LWOP on " 'the rare juvenile offender whose crime reflects irreparable corruption.' " (*Id*. at p. 2469, quoting *Roper*, *supra*, 543 U.S. at p. 573.)

14

With the guidance of *Roper, supra,* 543 U.S. 551, *Graham, supra,* 560 U.S. 48, and *Miller, supra,* 132 S.Ct. 2455, the California Supreme Court determined "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment." (*People v. Caballero* (2012) 55 Cal.4th 262, 268.) The court in *Caballero* reasoned: "*Miller* . . . made it clear that *Graham*'s 'flat ban' on life without parole sentences applies to all nonhomicide cases involving juvenile offenders, including the term-of-years sentence that amounts to the functional equivalent of a life without parole sentence imposed in this case. [¶] Defendant in the present matter will become parole eligible over 100 years from now. [Citation.] Consequently, he would have no opportunity to 'demonstrate growth and maturity' to try to secure his release, in contravention of *Graham*'s dictate. [Citations.] *Graham*'s analysis does not focus on the precise sentence meted out. Instead . . . it holds that a state must provide a juvenile offender 'with some realistic opportunity to obtain release' from prison during his or her expected lifetime." (*Caballero, supra,* at pp. 267-268, fn. omitted.)

In reaching these conclusions, our high court noted *Miller, supra,* 132 S.Ct. 2455 had "extended *Graham*'s[, *supra,* 560 U.S. 48] reasoning (but not its categorical ban) to homicide cases . . . ." (*Caballero*, *supra*, 55 Cal.4th at p. 267.) The court pointed out *Miller* "also observed that 'none of what [*Graham*] said about children--about their distinctive (and transitory) mental traits and environmental vulnerabilities--is crime-specific. Those features are evident in the same way, and to the same degree, when . . . a

15

botched robbery turns into a killing. So *Graham's* reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide.' " (*Caballero, supra,* at p. 267.)

These cases provide clear rules for the sentencing of juveniles. A juvenile cannot be sentenced to capital punishment for any crime. (*Roper*, *supra*, 543 U.S. at pp. 578-579.) A sentencing court may not sentence a juvenile to prison for life without the possibility of parole for nonhomicide offenses. (*Graham*, *supra*, 560 U.S. at pp. 74-75.) A sentence for a juvenile who committed a nonhomicide offense that consists of a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy is prohibited. (*Caballero*, *supra*, 55 Cal.4th at p. 268.) Mandatory life-without-parole sentences for juveniles, even those who commit homicide, are not permitted. (*Miller*, *supra*, 132 S.Ct. at p. 2464.) An LWOP sentence for juveniles who committed a homicide offense is allowable only if the court considers the " 'mitigating qualities of youth' " and limits "this harshest possible penalty" to those "rare juvenile offender[s] whose crime[s] reflect[] irreparable corruption." (*Id*. at pp. 2467, 2469.)

Here, the superior court sentenced Watson under section 190.5, subdivision (b). That subdivision provides: "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life." Our high court interpreted section 190.5,

16

subdivision (b), and in doing so, concluded that section 190.5, subdivision (b) is constitutional. Specifically, the court stated:

> "[W]e hold that section 190.5[, subdivision] (b), properly construed, confers discretion on a trial court to sentence a 16– or 17–year–old juvenile convicted of special circumstance murder to life without parole or to 25 years to life, with no presumption in favor of life without parole. We further hold that *Miller*[, *supra*, 132 S.Ct. 2455] requires a trial court, in exercising its sentencing discretion, to consider the 'distinctive attributes of youth' and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders' before imposing life without parole on a juvenile offender. [Citation.] Because the sentencing regime created by section 190.5[, subdivision] (b) authorizes and indeed requires consideration of the distinctive attributes of youth highlighted in *Miller*, we find no constitutional infirmity with section 190.5[, subdivision] (b) once it is understood not to impose a presumption in favor of life without parole." (*Gutierrez, supra,* 58 Cal.4th at pp. 1360-1361.)

The court also explained the factors, under *Miller*, *supra*, 132 S.Ct. 2455, a sentencing court must consider. "First, a court must consider a juvenile offender's 'chronological age and its hallmark features--among them, immaturity, impetuosity, and failure to appreciate risks and consequences." (*Gutierrez*, *supra*, 58 Cal.4th at p. 1388.) "Second, a sentencing court must consider any evidence or other information in the record regarding 'the family and home environment that surrounds [the juvenile]—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional.' " (*Id*. at pp. 1388-1389.) "Third, a court must consider any evidence or other information in the record regarding 'the circumstances of the homicide offense, including the extent of [the juvenile defendant's] participation in the conduct and the way familial and peer pressures may have affected him.' " (*Id*. at p. 1389.) "Fourth, a court

17

must consider any evidence or other information in the record as to whether the offender 'might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.' " (*Ibid*.) "Finally, a sentencing court must consider any evidence or other information in the record bearing on 'the possibility of rehabilitation.' " (*Ibid*.)

## C.  Analysis

As a threshold matter, we observe that Watson asks this court to declare "that the Eighth Amendment creates a categorical ban on life-without-parole sentences for juveniles who commit homicide."  However, Watson does not offer any authority to support his urged categorical ban.  Indeed, existing precedent undermines Watson's position.  The United States Supreme Court explicitly stated that it was "not foreclos[ing]" the ability of a sentencing court to impose "this harshest possible penalty" of LWOP on " 'the rare juvenile offender whose crime reflects irreparable corruption.' " (*Miller*, supra, 132 S.Ct. at p. 2469.)  Moreover, recently the United States Supreme Court cited *Miller* with approval, noting, "*Miller* made clear that 'appropriate occasions for sentencing juveniles to this harshest possible penalty [LWOP] will be uncommon.' " (*Montgomery v. Louisiana* (2016) ___ U.S. ___ [136 S.Ct. 718, 733-734] (*Montgomery*).)  Accordingly, contrary to the right Watson implores us to find, the United States Supreme Court has consistently held an LWOP sentence for certain juvenile homicide offenders does not violate the Eighth Amendment, although such a sentence is likely to be rare.  We

18

find no reason to create a new constitutional right where our United States Supreme Court has not found one.

Relying on *Miller*, *supra*, 132 S.Ct. 2455 and *Montgomery*, *supra*, 136 S.Ct. 718, Watson also maintains that section 190.5, subdivision (b) violates the Eighth Amendment because it provides the sentencing court with the discretion to sentence a juvenile offender to an LWOP sentence. Watson's reliance on *Miller* and *Montgomery* in support of his position is misplaced. Neither opinion suggests that a sentencing court does not have the discretion to sentence a juvenile homicide offender to an LWOP sentence. To the contrary, the court in *Miller* anticipated that a sentencing court could exercise such discretion provided the court considered the appropriate factors and limited the imposition of an LWOP sentence to a juvenile offender "whose crime reflects irreparable corruption." (*Miller*, *supra,* at p. 2469; see *People v. Palafox* (2014) 231 Cal.App.4th 68, 91 ["The decision [*Miller*] 'mandates *only* that a sentence follow a certain process--considering an offender's youth and attendant circumstances--before imposing a particular penalty.' "].) And the California Supreme Court found that section 190.5, subdivision (b) passed constitutional muster so long as it was clear the statute does not impose a presumption in favor of LWOP. (*Gutierrez*, *supra*, 58 Cal.4th at p. 1361.) Here, there is no indication in the record that the superior court presumed Watson should receive an LWOP sentence under section 190.5, subdivision (b).

In short, Watson provides no authority that supports his position that a non-mandatory LWOP sentence for a juvenile offender who commits a homicide violates the Eighth Amendment regardless of the factors set forth in *Miller*, *supra*, 132 S.Ct. 2455.

19

Likewise, he offers no authority to support his contention that section 190.5, subdivision (b) violates the Eighth Amendment. Therefore, Watson's challenge under the Eighth Amendment is little more than a claim that the superior court abused its discretion in sentencing him to LWOP.

A court's exercise of discretion will not be disturbed on appeal absent a showing that the court acted in an arbitrary, capricious, or patently absurd way, resulting in a manifest miscarriage of justice. (*People v. Jordan* (1986) 42 Cal.3d 308, 316.) "In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' [Citations.] Second, a ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' " (*People v. Carmony* (2004) 33 Cal.4th 367, 376-377.)

In arguing the court abused its discretion in sentencing him to LWOP, Watson insists that the superior court did not sufficiently consider the requisite factors under *Miller, supra,* 132 S.Ct. 2455 and *Gutierrez, supra,* 58 Cal.4th 1354. To this end, Watson contends the court did not consider his transient immaturity at the time of the crime. Watson's position is completely undermined by the record. The court found Watson: (1) was only four months shy of his 18th birthday when he committed the

20

murder; (2) was a principal in planning the armed robbery; (3) chose to arm himself; (4) chased down and shot a defenseless older woman in the back; (5) had the presence of mind to collect the discharged shell casing; (6) showed no remorse whatsoever for what he had done; and (7) continued to commit numerous crimes after the murder. Given these findings, we find no abuse of discretion in the court's conclusion that Watson's crime reflected irreparable corruption. This is especially true when Watson has such an extensive criminal record after the murder in question.[3] As such, the superior court did not have to guess whether Watson's committing homicide four months shy of his 18th birthday was simply an anomaly or part of a pattern of violent criminality highlighting Watson's irreparable corruption. In light of this overwhelming evidence, it is clear Watson's argument here is a simple disagreement with the court's conclusion that his crime was not a result of his transient immaturity but irreparable corruption.

"The trial court here thoughtfully weighed the applicable factors, particularly [Watson's] youth and its attendant circumstances, and implicitly concluded that [Watson]

---

[3]   In 1995, Watson was convicted of committing a robbery in Indiana. On November 8, 1995, Watson pled guilty to committing a battery on another person and misdemeanor burglary. On October 23, 1996, Watson pled guilty to entering a store and attempting to steal a bottle of beer. He was sentenced to prison for 16 months. On November 5, 1997, Watson was convicted of committing arson, false identification to a peace officer, and resisting a peace officer. He was sentenced to prison for 32 months. On December 17, 1997, Watson was convicted of driving under the influence and being in possession of a controlled substance. On January 22, 2001, Watson pled guilty to taking personal property and intending to steal it with a prior conviction for theft. He was sentenced to prison for 32 months. On July 20, 2004, Watson pled guilty to inflicting corporal injury on a spouse and sentenced to prison for four years. On January 24, 2008, Watson pled guilty to possessing a switchblade knife, a misdemeanor. On January 20, 2009, while in custody for the homicide offense, Watson assaulted another inmate.

was unfit ever to reenter society. We cannot say it exceeded the bounds of reason, all of the circumstances being considered, under section 190.5, subdivision (b)." (*People v. Palafox*, *supra*, 231 Cal.App.4th at p. 91.)

### D. Watson's Additional Eighth Amendment Contentions

In supplemental briefing, Watson raises additional Eighth Amendment challenges with scant authority for support. He insists an LWOP sentence under section 190.5, subdivision (b) is actually a "determinate term of imprisonment of 25 years or less, because during that time period the minor may receive a new sentence of 25 years to life, and if a 25 years to life sentence is not imposed within the 25-year time period the life without parole sentence becomes final." Watson reasons that this "25-year cut off point for minors" sentenced to an LWOP is both "unusual and irrational" because minors who commit identical crimes of special circumstance murder have additional time "to show they have been rehabilitated and should be released." Watson also claims the "limbo" of a minor sentenced to LWOP waiting up to 25 years before he or she knows whether his or her actual sentence will be for LWOP or 25 years to life is "inherently cruel."

The People maintain Watson forfeited these arguments by failing to raise them with the superior court below. However, we exercise our discretion to address these pure questions of law.

As a threshold matter, we observe that, within these Eighth Amendment challenges, Watson does not address the fact that the only juvenile offender who could be sentenced to LWOP under section 190.5, subdivision (b) is one whose crime the court determined reflects "irreparable corruption." The court can only make such a

22

determination after considering the factors set forth in *Miller*, *supra*, 132 S.Ct. at page 2469 as discussed in *Gutierrez, supra*, 58 Cal.4th at pages 1388 through 1389. Further, the instances under which a court will sentence a juvenile to LWOP will be rare. (See *Miller*, *supra*, at p. 2469; *Montgomery*, *supra*, 136 S.Ct. at pp. 733-734.)

Acknowledging that a court may only sentence a juvenile to an LWOP in very uncommon circumstances, we struggle to see how Watson's Eighth Amendment challenges in his supplemental brief have merit. A sentence violates the Eighth Amendment proscription against cruel and unusual punishment only if it is grossly disproportionate to the crime. (*Graham*, *supra*, 560 U.S. at p. 60.) Here, the crime was special circumstances murder, and an LWOP sentence is only appropriate if the individual did the actual killing and the court is convinced that the crime does not reflect transient immaturity, but instead, irreparable corruption. The sentence here, though undoubtedly harsh, does not shock the conscience and is not disproportionate. Watson robbed a woman in her fifties and then chased her down and shot her in the back when she tried to escape. He picked up the shell casing and left the area. An LWOP sentence for Watson is not unconstitutional under the Eighth Amendment.

II

*WATSON'S EQUAL PROTECTION AND DUE PROCESS CLAIMS*

A. Watson's Contentions

In a supplemental opening brief, Watson alleges additional constitutional challenges under the equal protection and due process clauses of the United States Constitution. He contends: (1) California's scheme for charging and trying minors as

adults and punishing them with LWOP's violates the equal protection clause; (2) section 190.5, subdivision (b) violates the equal protection clause; and (3) section 190.5, subdivision (b) violates due process under the United States and California constitutions.

As an initial matter, the People argue that Watson forfeited these arguments by failing to raise an equal protection or due process argument below. We do not address the forfeiture issue, but instead, we exercise our discretion to consider these challenges on the merits.

### B. Equal Protection

The Fourteenth Amendment to the United States Constitution prohibits the denial of equal protection of the laws.[4] "The constitutional guaranty of equal protection of the laws has been judicially defined to mean that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in like circumstances in their lives, liberty and property and in their pursuit of happiness." (*People v. Romo* (1975) 14 Cal.3d 189, 196.) "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." (*In re Eric J.* (1979) 25 Cal.3d 522, 530; italics omitted.) In other words, "an equal protection claim cannot succeed, and does not require further analysis, unless there is

---

[4]     California's constitutional guarantee of equal protection (Cal. Const., art. I, § 7) is substantially equivalent to that contained in the United States Constitution (U.S. Const., 14th Amend.), and our analysis of state and federal equal protection claims is substantially the same. (See *Manduley v. Superior Court* (2002) 27 Cal.4th 537, 571-572.) Thus, it does not change our analysis whether Watson claims his sentence violates equal protection under state or federal law.

some showing that the two groups are sufficiently similar with respect to the purpose of the law in question that some level of scrutiny is required in order to determine whether the distinction is justified."  (*People v. Nguyen* (1997) 54 Cal.App.4th 705, 714.)

Here, Watson first argues his sentence violates the equal protection clause because Welfare and Institutions Code sections 602 and 707 treat similarly situated minors, who are charged with special circumstances murder (§ 190.2, subds. (b), (c), (d)), differently. Specifically, Watson contends that minors who are alleged to have personally killed in the commission of a special circumstances murder (§ 190.2, subd. (b)) must be charged and tried as an adult (Welf. & Inst. Code, § 602, subd. (b)(1)).[5] Minors who do not personally kill in the commission of a special circumstances murder (§ 190.2, subds. (c) and (d)) may be charged and tried as an adult (Welf. & Inst. Code, § 707, subd. (d)(1) and (2)).[6] This argument, however, does not raise an equal protection issue because the

---

[5]    Watson relies on the former Welfare and Institutions Code section 602 that was effective January 1, 2015 when he was resentenced.  Subdivision (b)(1) of that former statute provided:  "(b) Any person who is alleged, when he or she was 14 years of age or older, to have committed one of the following offenses shall be prosecuted under the general law in a court of criminal jurisdiction:  [¶] (1) Murder, as described in Section 187 of the Penal Code, if one of the circumstances enumerated in subdivision (a) of Section 190.2 of the Penal Code is alleged by the prosecutor, and the prosecutor alleges that the minor personally killed the victim."  The former Welfare and Institutions Code section 602 was amended by initiative measure by way of the November 8, 2016 election and became effective the next day.

[6]    Watson cites to the former Welfare and Institutions Code section 707 that was effective January 1, 2015 when he was resentenced.  Subdivisions (d)(1) and (d)(2) provided in pertinent part:  "(d)(1) Except as provided in subdivision (b) of Section 602, the district attorney or other appropriate prosecuting officer may file an accusatory pleading in a court of criminal jurisdiction against any minor 16 years of age or older who is accused of committing an offense enumerated in subdivision (b).  [¶] (2) Except

minors are not similarly situated under the law.  One category of minors personally killed the victim in the commission of the felony murder while the other category of minors did not.  Indeed, the Legislature observed there is a difference between one who actually kills the victim and one who is not the actual killer in the commission of a felony murder by requiring the prosecution to prove any defendant, who was not the actual killer, acted with "reckless indifference to human life[.]"  (See § 190.2, subd. (d); *People v. Estrada* (1995) 11 Cal.4th 568, 578 ["[W]e conclude the generally accepted meaning of the phrase, 'reckless indifference to human life,' . . . conveys to the jury the requirement of a defendant's subjective awareness of the grave risk to human life created by his or her participation in the underlying felony."].)

Watson next argues that the equal protection clause has been violated because there is a disparity of treatment in the punishment of minors who are 14 or 15 years old as opposed to those minors who are 16 or 17 years old.  He points out that minors between 14 and 16 years old, may be punished for a special circumstances murder with a prison sentence of 25 years to life, the same punishment for adults who commit only first degree murder.  (§ 190.)  However, Watson emphasizes that minors who are between the ages of

---

as provided in subdivision (b) of Section 602, the district attorney or other appropriate prosecuting officer may file an accusatory pleading against a minor 14 years of age or older in a court of criminal jurisdiction in any case in which any one or more of the following circumstances apply:  [¶] (A) The minor is alleged to have committed an offense that if committed by an adult would be punishable by death or imprisonment in the state prison for life."  Welfare and Institutions Code section 707 was amended by initiative measure by way of the November 8, 2016 election and became effective the next day.

26

16 and 18 may be punished with a sentence of 25 years to life or LWOP. (§ 190.5, subd. (b).)

Much like Watson's first equal protection argument, we find this contention wanting. Again, Watson has not presented us with two similarly situated groups who are treated differently. In fact, juveniles under 16 years of age are not treated the same as juveniles who are over 16 years old in several respects. (See *Thompson v. Oklahoma* (1988) 487 U.S. 815, 824-825.) As the United State Supreme Court explained: "The line between childhood and adulthood is drawn in different ways by various States. There is, however, complete or near unanimity among all 50 States and the District of Columbia in treating a person under 16 as a minor for several important purposes. In no State may a 15-year-old vote or serve on a jury. Further, in all but one State a 15-year-old may not drive without parental consent, and in all but four States a 15-year-old may not marry without parental consent. Additionally, in those States that have legislated on the subject, no one under age 16 may purchase pornographic materials (50 States), and in most States that have some form of legalized gambling, minors are not permitted to participate without parental consent (42 States). Most relevant, however, is the fact that all States have enacted legislation designating the maximum age for juvenile court jurisdiction at no less than 16. All of this legislation is consistent with the experience of mankind, as well as the long history of our law, that the normal 15-year-old is not prepared to assume the full responsibilities of an adult." (*Id*. at pp. 824-825, fns. omitted.) Accordingly, Watson's second equal protection argument fails as well.

## C. Due Process

Watson's due process argument simply is a variation of his equal protection arguments: "There is no due process compelling state interest or rational basis for minors between the ages of 16 and 18 to be punished by life imprisonment without parole while minors between the ages of 14 and 16 are punished by 25 years to life." We conclude this contention is without merit.

"The touchstone of due process is fundamental fairness." (*Salas v. Cortez* (1979) 24 Cal.3d 22, 27; see *Gagnon v. Scarpelli* (1973) 411 U.S. 778, 790.) Typically, a due process violation is established when the state proceeds in a manner that renders a trial fundamentally unfair. Here, Watson does not focus on his trial, but instead, argues California's sentencing scheme under section 190.5, subdivision (b) violates due process. We disagree.

Again, Watson emphasizes the possibility that a juvenile between the ages of 16 and 18 may be sentenced to LWOP, but other 16 and 17 years olds as well as 14 and 15 years olds may not. However, he glosses over the fact that before any court may sentence a 16- or 17-year-old juvenile to LWOP, the court must consider the factors outlined in *Miller*, *supra*, 132 S.Ct. 2455 and *Gutierrez*, *supra*, 58 Cal.4th 1354 and find that the subject minor's crimes show "irreparable corruption" and do not reflect "transient immaturity." In the instant matter, the superior court engaged in such careful analysis and consideration when it resentenced Watson. Watson has not shown us there is any infirmity in this process that rendered his sentence or the California sentencing scheme based on section 190.5, subdivision (b) unfair.

28

Watson additionally suggests that his sentence and the California sentencing scheme violate some substantive due process right. Nevertheless, he has not identified the source of this right, and it is not our role to read some new right into either the United States or California constitutions. As such, Watson's due process claim fails.

DISPOSITION

The judgment is affirmed.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


AARON, J.

29