Filed 8/25/23  P. v. Rainey CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>CLYDE RAINEY,<br><br>  Defendant and Appellant. | A164100<br><br>(Contra Costa County<br> Super. Ct. No.<br>59807082) |

When he was 16 years old, defendant and a 14-year-old companion robbed an unarmed young man.  As the victim was standing with his hands in the air and his back towards defendant, the companion told defendant to shoot him.  The victim turned and looked into defendant's eyes, turned back, and defendant shot him twice in the back.  The victim died four days later.

In 1999, a jury convicted defendant of first-degree murder, found true a special circumstance that the murder was committed during a robbery, and found true an enhancement for personal use of a firearm.  The trial court sentenced defendant to life without the possibility of parole (LWOP).  This court affirmed the judgment.  (*People v. Rainey* (Feb. 7, 2001, A088153) [nonpub. opn.].)

After the United States Supreme Court decided *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*), defendant filed a habeas petition, which this Court

1

granted, remanding the case for resentencing in conformity with *Miller*. (*In re Rainey* (Feb. 28, 2014, A138921) [nonpub. opn.].)

Following a hearing in 2021, the trial court reimposed an LWOP sentence, plus four years for the personal use of a firearm.[1] Defendant claims the court failed to take into account youth-related mitigating factors as required by *Miller* and *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1378 (*Gutierrez*). We affirm.

## DISCUSSION

### *Applicable Legal Principles*

In *Miller*, the United States Supreme Court held that before a defendant who has committed a homicide offense as a juvenile can be sentenced to LWOP, a court must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller, supra,* 567 U.S. at p. 480.)

In the wake of *Miller*, our Supreme Court in *Gutierrez* upheld Penal Code section 190.5, subdivision (b), which permits courts to impose LWOP sentences on defendants convicted of committing murder while a juvenile, stating,

> "[W]e hold that [Penal Code] section 190.5[, subdivision] (b), properly construed, confers discretion on a trial court to sentence a 16– or 17– year–old juvenile convicted of special circumstance murder to life without parole or to 25 years to life, with no presumption in favor of life without parole. We further hold that *Miller* requires a trial court, in exercising its sentencing discretion, to consider the 'distinctive attributes of youth' and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders' before imposing life without parole on a juvenile offender. [Citation.]

---

[1] Thus, there was a seven-year lapse between issuance of our remittitur and the resentencing hearing. Defendant has not raised any complaints about this time lapse on appeal.

2

Because the sentencing regime created by [Penal Code] section 190.5[, subdivision] (b) authorizes and indeed requires consideration of the distinctive attributes of youth highlighted in *Miller*, we find no constitutional infirmity with [Penal Code] section 190.5[, subdivision] (b) once it is understood not to impose a presumption in favor of life without parole." (*Gutierrez, supra,* 58 Cal.4th at pp. 1360–1361.)

Thus, a trial court "must consider" the " 'distinctive attributes of youth' " that " 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders.' " (*Gutierrez, supra,* 58 Cal.4th at p. 1390.) "*Miller* requires sentencing courts to undertake a careful individualized inquiry before imposing life without parole on juvenile homicide offenders." (*Id.* at p. 1382.)

The court went on to identify five youth-related factors sentencing courts "must consider" before imposing LWOP: 1) the "juvenile offender's 'chronological age and its hallmark features– among them, immaturity, impetuosity, and failure to appreciate risks and consequences' "; 2) the juvenile's " 'family and home environment,' " such as "evidence of childhood abuse or neglect, familial drug or alcohol abuse, lack of adequate parenting or education, prior exposure to violence, and susceptibility to psychological damage or emotional disturbance"; 3) " 'the circumstances of the homicide offense, including the extent of the [juvenile's] participation in the conduct and the way familial and peer pressures may have affected him' "; 4) "whether the offender 'might have been charged and convicted of a lesser offense if not for incompetencies associated with youth' "; and 5) "any evidence or other information in the record bearing on 'the possibility of rehabilitation.' " (*Gutierrez, supra,* 58 Cal.4th at pp. 1388–1389.)

The court also acknowledged, "[o]f course, a sentencing court has discretion under *Miller* to decide on an individualized basis whether a 16- or 17-year-old offender is a ' "rare juvenile offender whose crime reflects

3

irreparable corruption." ' " (*Gutierrez, supra,* 58 Cal.4th at p. 1380.) However, " '[a] court which is unaware of the scope of its discretionary powers can no more exercise its 'informed discretion' than one whose sentence is or may have been based on misinformation regarding a material aspect of the defendant's record.' " (*Id.* at p. 1391.)

We review a trial court's sentencing decision for abuse of discretion. "A court's exercise of discretion will not be disturbed on appeal absent a showing that the court acted in an arbitrary, capricious, or patently absurd way, resulting in a manifest miscarriage of justice. [Citation.] 'In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, " '[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' " [Citations.] Second, a " 'decision will not be reversed merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." ' " " ' (*People v. Watson* (2017) 8 Cal.App.5th 496, 514 [affirming juvenile LWOP sentence].)

### *The Resentencing Ruling*

The trial court held both a *Franklin* hearing[2] and a *Miller/Gutierrez* resentencing hearing.

Prior to the hearings, defendant submitted extensive materials on his behalf, including an undated report by mitigation specialist Susan Lake, a 1998 report by neuropsychologist Dr. Nell Riley, and a 2021 report by clinical

---

[2] *People v. Franklin* (2016) 63 Cal.4th 261.

psychologist Dr. Laurence Miller. These reports purported to chronicle in considerable detail limitations in defendant's mental development and adversities defendant faced during adolescence.

The court subsequently held a hearing devoted to the prosecution's objections to these reports. Ultimately, portions of the reports were excised and the court ordered that defendant and Dr. Miller appear and be available for cross-examination. Neither defendant nor the prosecution raise any complaints about the handling of the reports. Indeed, defendant states in his opening brief that "[i]n deference to the court's discretion as to credibility matters, [he] does not rely at all on [the] reports and instead relies solely on the factual materials generated by the probation department, the juvenile court and other unchallenged sources."

The trial court then proceeded with the *Franklin* hearing, at which time defendant and Dr. Miller testified. Defendant testified to, among other things, the challenges he faced growing up, his relationship with his companion the night of the shooting, and his experience during his time in prison. On cross-examination, the prosecution elicited additional information, including that defendant engaged in repeated violent and criminal behavior prior to the crime, and after being informed he was statutorily eligible for parole consideration after serving 25 years, continued to accrue prison rule violations and sanctions for improper conduct.

Dr. Miller also testified and was cross-examined at length over the course of several days. In his view, as a young adolescent, defendant was impulsive, pleasure-seeking, had a difficult time considering the future consequences of his actions, and engaged in high-risk activities. He attributed this to the attributes of youth, the difficult and violent social milieu in which defendant lived, and defendant's apparent emotional and neurological deficits.

On cross-examination, Dr. Miller acknowledged that while he had reviewed the police reports of all of defendant's criminal conduct, including the murder, he did not review the videotapes of defendant's statement to the police or of his conversation with his mother where he confessed to the murder, and that he spoke with defendant, himself, for only an hour by phone. Miller acknowledged he had made many assumptions about the facts based on Ms. Lake's and Dr. Riley's reports, and if either was incorrect as to the facts, that would affect the correctness of his own assessments. He acknowledged that while defendant had not been diagnosed as having antisocial personality disorder because it is not a diagnosis appropriately made as to children, defendant exhibited the symptoms of the adolescent equivalent, conduct disorder. He acknowledged that based on Dr. Riley's 1998 report, a medical evaluation of defendant's neurological condition, which included a PET scan, was done, and the physician conducting the examination did not diagnosis defendant as having any birth related neuropsychological disorder. He acknowledged there was no evidence defendant's neurological functioning had any connection to his murdering the victim. He acknowledged defendant was never homeless. He acknowledged there was no documented evidence defendant's mother abused alcohol or drugs, e.g., no record of defendant being born with fetal alcohol syndrome, and no police record of his mother ever being intoxicated. He acknowledged there was no documented evidence defendant was beaten and whipped as a very young child. He acknowledged that while his opinion was that defendant did not have the "average 16-year-old brain," he had no medical evidence that was the case.

On redirect, Dr. Miller stated defendant reported abusing alcohol by the age of 12. Defendant also told Miller his mother had problems with

6

alcohol and also said his mother told him his father had "whipped" him between the ages of one and three. The neurological PET scan indicated "some anomalies" in defendant's brain and specifically "some issue with the difference in his two lobes" which might indicate defendant's brain was not that of an average 16-year-old and might have had a developmental impact. Miller did not diagnosis defendant with conduct disorder because some aspects of defendant's conduct did not support such a diagnosis.

After determining which documents would comprise the *Franklin* "packet" for forwarding to the parole board, the trial court turned to the *Miller/Gutierrez* hearing. The court commenced by stating, "I would like to state that in preparation for this hearing, I have reviewed the entire file. · I have reread the appellate court decision, as well as this Court's decision on setting the sentencing hearing, which was filed March 2nd, 2020. · I've read all of the materials submitted by counsel. · I've considered all of the testimony that was received. · I've reviewed my notes and the transcripts for all of the prior hearings."

With respect to the original sentencing, the trial court observed that "[m]issing from" this court's prior affirmance of that sentence, was "a full consideration of the factors now constitutionally mandated under Miller related to the distinctive attributes of youth that diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes because Miller requires sentencing courts to consider how children are different and how those differences counsel against irrevocably sentencing them to a lifetime in prison."

The court then heard argument by counsel. Defense counsel argued defendant was not an "irredeemable or irrevocably corrupt minor" for whom an LWOP sentence was permissible or appropriate under *Miller*, that he had

7

"taken responsibility for what he did within hours of his arrest and has always expressed his remorse," and that he "suffered many of the difficulties and tragic circumstances that the Miller court contemplated when thinking about the particular circumstances that a minor might have to overcome or deal with when confronting—when analyzing a case like this, that environment and home community."

The prosecutor emphasized asserted evidentiary shortcomings in the evidence defendant had presented at the *Franklin* hearing and claimed dictated a lesser sentence, pointing out defendant had had nearly 10 years "to produce competent evidence to support [his] request for resentencing to something other than LWOP," but had presented "nothing . . . that is not based on hearsay, other than Mr. Rainey's own testimony. . . . [E]verything else that was provided to you, the Court has to take a leap of faith in order to embrace it." There were no affidavits, no live testimony—not a "single source of direct testimony as to the hallmarks of youth [defendant] wants you to consider." The prosecutor also emphasized defendant's history of escalating violent criminal conduct prior to the murder and contrasted his criminal conduct with the vulnerability of the victim and the impact on the victim's family. The prosecutor also observed that defendant would, in any case, soon receive a youthful parole hearing, "[s]o striking the special circumstance enhancements will not get him anything that he has not already achieved by operation of law."

Following argument by counsel, defendant was permitted to make a statement to the court, wherein he expressed remorse and stated he wished he "could take it all back."

Thereafter, the court discussed its view of the defense evidence, stating it had "prepared very carefully for the hearing," and had, pursuant to

8

defendant's request, admitted for purposes of the resentencing hearing Ms. Lake's, Dr. Reilly's, and Dr. Miller's reports, noting much of the information in those reports had been "fleshed out" during the *Franklin* hearing. The court went on to state it found the reports "to be quite unreliable" because they relied "primarily on hearsay." Dr. Miller's testimony was of special concern to the court because it "found him repeatedly looking at [defense counsel] as though for guidance, and [] she assiduously avoided his gaze or was looking down at her notes. · She did not signal him, but I felt that he was flailing. · He had clearly numerous important inaccuracies." The court then enumerated a number of the inaccuracies in his report and his testimony.

The court also found defendant's testimony "troubling," stating it "wasn't entire[ly] credible" and "[s]everal remarks appeared intended to exaggerate or stretch the truth."

The court then discussed the *Miller/Gutierrez* factors, stating,

"In considering the distinctive attributes of youth, the hallmark features of immaturity, impetuosity and failure to appreciate the risks and consequences, as well as the capacity for growth and change, I will note I'm not going to review each one of these factors in great detail. I think they've been expressed well in the papers.

"I will note that with regard to the youth-related factors, the defendant was 16 years old, 10 months. I don't find that he was immature or acting with impetuosity with regard to the particular facts of this event. The family and home life, certainly this dysfunction and neglect, which admittedly is there, is not so profound as to bring him into that position that you would justify his behavior just from his home life. Certainly, the circumstances of the crime, no alcohol or drugs, were a factor, and his background, as Judge Arneson noted, was one which demonstrated continuing—increasing seriousness, continuing engagement and violent conduct that indicates that he is a serious danger to society.

"I—in factoring in factors relating to the crime and aggravation, the crime involved great violence and a high degree of cruelty. The defendant used a firearm in the murder. The victim was particularly vulnerable. The

9

manner of the crime indicated planning and sophistication. Factors relating to the defendant, I have mentioned some of them, but it also includes that he engaged in violent conduct, not for the first time, that indicates he is a serious danger to society. His sustained petitions were of increase in seriousness. He was on probation at the time of the murder, and his performance on juvenile probation was unsatisfactory."

The court concluded by stating,

"I do not find factors in mitigation. Probation is denied. The motion to strike the special circumstances is denied. As to Count 1, I'm sentencing [defendant] to the term of life in prison without possibility of parole. As to the use of the firearm, of Penal Code Section 12022.58, the midterm of four years, which is to be served consecutively, based on all of the factors that I've cited, as well as the factors cited by Judge Arneson in the original sentencing. Credits do not need to be determined at this time."

*ANALYSIS*

Pointing to the court's statement, "I do not find factors in mitigation," defendant maintains the court "arbitrarily and prejudicially refused to recognize the existence of any mitigation whatsoever . . . , notwithstanding the undisputed evidence of well-established mitigating factors." He asserts that had the court "recognized the existence of mitigating factors but had given reasons why those factors carried less weight tha[n] the aggravating factors, that could constitute an informed exercise of discretion that is reviewable only for abuse of discretion." But because of the court's asserted "failure/refusal to recognize that the evidence presented had some mitigating import, its weight . . . in comparison to the aggravating evidence, cannot," according to defendant, "be deemed an informed exercise of discretion," thus rendering his LWOP sentence per se invalid. (Underscoring omitted.)

In other words, defendant appears to be trying to remove his challenge to the trial court's resentencing decision from the ambit of the abuse of discretion standard and, instead, to cast his challenge as essentially a

10

procedural one as to which no deference is owed to the court. Defendant's assertion that the trial court had blinders on is not warranted by the record or by fundamental principles of appellate review.

To begin with, it is clear the trial court was fully conversant with the mandate of *Miller* and *Gutierrez*. As the court stated, the matter was before it for "a full consideration of the factors now constitutionally mandated under Miller related to the distinctive attributes of youth that diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes because Miller requires sentencing courts to consider how children are different and how those differences counsel against irrevocably sentencing them to a lifetime in prison."

It is also clear the court considered all the evidence proffered by the defense and the prosecution, including the reports submitted by defendant and the testimony given at the *Franklin* hearing, as the court expressly said it considered everything before it.

Finally, it is clear there is evidence in the record supporting the trial court's determination that even taking into account the *Miller/Gutierrez* factors, an LWOP sentence was permissible.

*Factor One: Age and Maturity Level*

Defendant asserts the court "ignored the undisputed evidence of neurological impairments and developmental disabilities that clearly put [defendant] well behind his age cohort regarding intellectual and social development." He cites to the 1999 probation report stating "two neurological examinations show[ed]" defendant having an IQ of 75, and to Dr. Riley's 1998 report stating he was in special education classes as of the second grade and when he was in the fifth grade, he tested in the second percentile in reading.

11

He also cites to the statement in Riley's report that his birth records "revealed abnormal neurological signs" but no follow up was done at the time.

However, as we have discussed, the nature of defendant's neurological impairment and extent of his "developmental disabilities" was called into sharp question by the prosecutor's extensive cross-examination of Dr. Miller. As Miller acknowledged, Riley's report precipitated a medical examination that included a PET scan, and the physician conducting the examination did not diagnosis defendant as having a medical neuropsychological disorder. There was also evidence defendant was not as "developmentally disabled" as he claimed to be. The 1996 probation report noted defendant's grades were "fairly good" in 1995:

> "On September 12, 1995, the minor was enrolled in the Richmond School District's Independent Learning Program. . . . The minor's attendance during the first quarter was basically very good, with the exception of several tardies. His behavior, however, was considered to be borderline and problematic on several occasions. [Defendant] frequently had to serve time out periods away from the main group, due to threats, rude behavior, insubordination, being argumentative, and use of profanity. He also threatened and used abusive language towards a classroom teaching aide. His grades were math, 'A'; history, '"'; P.E, 'C'; English, 'C'; Science, 'B.' [The school teacher] states that although Clyde's grades were fairly good, he often exhibited a negative attitude and frequently expressed anger towards his mother and [her] boyfriend, regarding their home situation." (Capitalization omitted.)

Defendant also claims his "immediate statements of abject acceptance [of his responsibility for the shooting] and remorse strongly indicate" his "conduct had been impulsive and without consideration in the moment of the risks and consequences of acting on the impulse." However, criminal defendants of any age can, and do, act in the moment without weighing the likely consequences. Moreover, there was evidence defendant was more self-aware than he portrayed at the resentencing hearing. The 1997 probation

12

report commented on defendant's familiarity with criminal behavior and its risks and consequences as follows:

> "While there is little reason to suspect that the minor carefully planned the murder of the victim, there can be no doubt that the minor was fully aware of the backgrounds of the juveniles and adults with whom he chose to spend his time. In talking with the police the minor admitted knowing that some of these characters were suspects in other homicides. Additionally[,] the minor was cognizant of the possession and use of guns by these individuals. Finally[,] the minor attempted to deceive and dissuade sheriff's detectives until it was quite clear to him that the authorities had considerable evidence against him." (Capitalization omitted.)

The 1999 probation report similarly stated,

> "No matter how naïve and unsocialized he may have been, and even if he did not know where things were going at the onset of the crime, once he was given the gun and directed to shoot, it is hard to believe he did not know exactly what he was doing. Instead of stopping, he shot the victim not once but twice in the back."

*Factor Two: Family and Home Environment*

Defendant maintains the trial court "recognized but then dismissed" evidence of environmental vulnerabilities, asserting the court "impos[ed] a virtually unattainable standard for evaluating the evidence of environmental vulnerabilities." He points to the 1994 probation report that stated his mother was 19 years old at the time he was born and his biological father left when defendant was four years old. The report further stated,

> "The mother appears ineffective and disinclined to supervise and control [defendant]. She describe[d] his behavior at home as 'pretty good, except when he is behind her back.' She has little or no insight into his behavior, and has adopted the position that he gets in[to] trouble because he follows others."

The trial court recognized there was "certainly . . . dysfunction and neglect." But it went on to find defendant's family and home life were "not so

13

profound[ly negative] as to bring [defendant] into that position that would justify his behavior just from his home life."

While defendant takes issue with the court's phraseology, claiming the court was applying an impossible "justify his behavior" standard, this is hardly a fair criticism. The clear import of the court's statement is that given the *entirety* of the evidence before it,[3] this factor did not weigh against an LWOP sentence.

*Factor Three: Circumstances of The Offense*

Defendant maintains the trial court also "fail[ed] to acknowledge" and give "mitigating weight" to defendant's "subordinate role" in the killing. "By all accounts," says defendant, his cohort, Donald Clark, "was the moving force in the robbery and murder."

He cites to a sentencing statement by the chief sheriff's investigator that Clark was a hardened gang killer, the crime " 'would never have happened' " but for Clark's influence, and defendant was " 'unlike' " Clark and a " 'typical "follower." ' " Defendant claims "[t]he undisputed evidence . . .

---

[3] This evidence included, for example, the 1997 probation report stating,

> "In February of 1996, the minor's relationship with his family was said to have been quite unstable and defiant. According to his mother this is no longer true and she asserts that the problems referred to in earlier reports existed for just a short time. . . . [The mother] claims that the minor has always responded well to his uncle whenever he has intervened and that she has had very few problems herself recently when she has asked him to do things around the house. In her mind he is almost a model son at home. On the other hand[,] she admits that his behavior away from home, has been a course of concern for some time. She seems to believe that his behavior only becomes offensive when he comes under the influence of alcohol or other youngsters."

14

is that the older codefendant[4] . . . was the moving force in the robbery, brought the handgun, initiated the robbery, and then 'handed [defendant] the gun and told him to shoot the victim in the back.' "

However, the court pointed out the crime also "involved great violence and a high degree of cruelty," that "defendant used a firearm in the murder," and the "victim was particularly vulnerable." Indeed, the 1999 probation report stated defendant not only shot "an innocent, unresisting" young man "twice in the back" but "was willing to do [so] even after the victim, who did not put himself in jeopardy, looked upon defendant for the last time to see whether the defendant intended to follow the directions of his companion." (Capitalization omitted.) Furthermore, defendant told police officers he did not feel pressured by his companion and was not afraid of him.

*Factor Four: Incompetencies Associated with Youth*

In *Gutierrez,* the court explained that the fourth factor—incompetencies associated with youth—focuses on whether the defendant's youth compromised his ability to navigate the criminal justice process. The high court explained a sentencing court "must consider any evidence or other information in the record as to whether the offender 'might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. See, *e.g., Graham* [*v. Florida*] 560 U.S. [40,] 78 . . . ("[T]he features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings"); *J.D.B. v. North Carolina,* 564 U.S.

---

[4] Defendant's cohort was, in fact, 14 years old at the time, at least two years younger than defendant.

[261, 271–274] . . . (2011) (discussing children's responses to interrogation).' " (*Gutierrez, supra,* 58 Cal.4th at p. 1389.)

Defendant complains the trial court made "no reference whatsoever" to this factor, and specifically no reference to defendant's rejection of a plea deal under which he would have received 29 years to life sentence. After accepting the deal, he rejected it, stating he "wanted to take his chances at trial." Defendant now maintains this "was an entirely irrational about-face given that there was virtually zero chance of obtaining a better result."

Defendant is correct that the trial court did not expressly address this factor. What the trial court did say was, "I'm not going to review each one of these factors in great detail. · I think they've been expressed well in the papers." The court also said it had reviewed all the material before it, and defense counsel expressly argued defendant had exhibited an immature approach to the criminal justice process, specifically mentioning his rejected of a plea deal.

That the court did not expressly address this factor does not demonstrate error. To begin with, no case has held that a resentencing decision must take the form of a checklist, where each *Miller/Gutierrez* is separately identified and addressed. Furthermore, absent affirmative evidence to the contrary, of which there is none here, we must presume the trial court followed the law and considered the relevant factors. (E.g., *Gutierrez, supra*, 58 Cal.4th at p. 1390 ["[a]bsent evidence to the contrary, we presume that the trial court knew and applied the governing law"]; Cal. Rules of Court, rule 4.409 ["Relevant factors enumerated in these rules must be considered by the sentencing judge, and will be deemed to have been considered unless the record affirmatively reflects otherwise."].)

In his reply brief, defendant maintains California Rules of Court, rule 4.409 is inapplicable, citing *People v. Simpson* (1979) 90 Cal.App.3d 919 (*Simpson*).  In *Simpson*, the trial court was required to impose the middle term for a liquor store robbery unless it found circumstances in aggravation or mitigation.  (*Id.* at pp. 922–923.)  The probation report "[i]nexplicably" listed " 'none' " under the heading " 'Circumstances in Mitigation,' " even though the record indicated the defendant was unquestionably suffering from alcoholism and alcoholism was listed as a circumstance in mitigation.  (*Id.* at p. 927.)  Stating that "[t]he [trial] court, however, did not take into account [defendant's] alcoholism as a mitigating circumstance," the Court of Appeal concluded the lower court could not "be viewed as having exercised its discretion or as having weighed the circumstances." (*Ibid.*)  Nor, under the facts of the case, did California Rules of Court, rule 409 assist the prosecution as the record "not only reflect[ed] that the trial court did not consider the mitigating circumstance but that in fact it considered [the defendant's] alcoholism as an aggravating circumstance." (*Simpson,* at p. 927.)

In other words, in *Simpson,* the record "affirmatively reflected" that the trial court failed to consider the defendant's alcoholism as a mitigating factor as required by the law and erroneously considered it an aggravating factor. The record here, in contrast, contains no affirmative evidence showing that the trial court "ignored" any of the mitigation evidence presented by defendant or failed to consider any of the *Miller/Gutierrez* factors.

*Factor Five: Rehabilitation*

Finally, defendant maintains that the trial court failed to consider his prospects for rehabilitation, focusing on his expressions of remorse and acceptance of responsibility for the offense.  Defendant highlights that after "amateurish efforts to deny involvement in the offense when initially

17

questioned," defendant admitted to his mother at the police station that he " 'did it' " and thereafter he repeatedly expressed remorse for the crime, as documented in the 1999 probation report:

> " 'I murdered somebody for no reason during a robbery. I shot him in the back twice. My partner and I held him at gunpoint, pat him down and I shot him; he had no money. It happened so fast, [companion] gave me the gun, after I shot the dude, I ran because I was scared. I shot somebody I then went to my partner's house and got high. I don't know why I got involved. I should get time for what I did, not for the rest of my life. It ain't going to bring him back and it ain't going to change what happened. I feel what I did was wrong, wrong, shooting someone. I feel bad for the family and I'm sorry I didn't realize how precious life was until now I think about my family and the guy I shot and how his family feels. First time I was locked up I had nightmares. Like I'm at a grave site, leaving something on the grave of the dude I killed and then I wake up.' "

Defendant also expressed remorse at the 2021 resentencing hearing:

> "I wish that I could take it back. I think of his kids. I understood that he had kids afterwards, and I think about them and think about the pain that I have caused them, and I wish that I could take it all back. But the only thing that I can do now is to try to live each day a better day, and I'm just–I just wish that I could take everything back. I just hate the pain that I've caused everyone. It's one of my deepest regrets."

The trial court, however, took a more in depth look at defendant's criminal history and found it evidenced escalating violent behavior. In March 1993, at age 13, defendant first came to the attention of law enforcement for possession of a stolen vehicle. That same month, he threatened to kill an employer. According to the police report from the incident, defendant told his employer " 'I'm going to North Richmond to get my friends with guns and I'm coming back to kill you.' " In April, defendant went to his former elementary school and attacked a student in the schoolyard, kicking him in the stomach and hitting him in the head.

18

In May 1995, defendant and two other teenagers attacked a fellow high school student on schoolgrounds, leaving the victim with a bloody nose and mouth, bruised head and elbows, and scraped knee. Defendant was on probation at the time. In December, defendant, while intoxicated, got into an argument with his mother. When his four-year-old brother walked between the two, defendant picked him up and threw him 10-12 feet across the room. Defendant then pushed his mother to the floor and began strangling her.

In April 1996, while serving a six-month sentence at Byron Boy's Ranch, defendant assaulted another ranch resident.

A March 1997 probation report summed up defendant's conduct as follows:

> "As already stated, the minor did not give good indication of taking advantage of the ranch program during the time he was there. Indeed[,] the minor had to be removed and then returned again later following a stay at juvenile hall. Since leaving the ranch he has had another episode with drug abuse. In all of the time that the minor was on probation, he was never able to complete a work detail program. [¶] . . . The minor turns eighteen in nine months. In four years he has not been able to alter the course of his criminal behavior. In fact there is indication that he has accelerated his criminal behavior in that he has now engaged in a most heinous crime."

At the *Franklin* hearing, defendant testified about what he had done in prison to improve himself. He was taking a GED prep class (which he had commenced only on learning he was eligible for a youthful offender parole hearing), had completed an Alternatives to Violence Program, and had started, but not completed, a welding course, Narcotics Anonymous, and Alcoholics Anonymous. The trial court was underwhelmed by this meagre effort over more than 20 years of incarceration.

Furthermore, defendant acknowledged that while incarcerated, he had been involved in a prison riot; committed multiple rule violations, including

19

possessing methamphetamine and two instances of possessing contraband cellphones; was sanctioned for indecent exposure; and failed to complete court-ordered programs. Three of defendant's rule violations occurred in 2018 and 2019, after he learned about his eligibility for a parole board hearing.

In sum, the record reflects that the trial court devoted a great deal of time to defendant's *Franklin* and *Miller/Gutierrez* hearings, was fully conversant with the applicable law, and thoughtfully reviewed all the evidence before it for the express purpose of considering youth related factors as required by *Miller* and *Gutierrez.* The court undertook the "careful individualized inquiry" *Gutierrez* calls for. (*Gutierrez, supra,* 58 Cal.4th at p. 1382.) That defendant disagrees with the court's decision or that another trial court might have reached a different conclusion, does not render the court's decision here arbitrary or irrational. (See *People v. Carmony* (2004) 33 Cal.4th 367, 377 [[A] sentencing " ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' "].)

And on this record, given the deferential standard of review that applies, we cannot conclude the court's decision exceeded the bounds of reason. We therefore affirm the trial court's resentencing determination.[5] In so doing, we observe, as the parties have commented, that defendant will

_____

[5] Given our conclusion that defendant has not shown the court failed to consider the *Miller/Gutierrez* factors, we likewise conclude he has not established a due process violation constituting a miscarriage of justice. Nor do we reach defendant's claim that the trial court "demonstrate[d] a fundamental, if not willful, miscarriage of justice," and therefore the case should be reassigned to a different judge on remand.

receive, or perhaps has already received, a youth offender parole hearing under Penal Code section 3051, subdivision (b)(4). At that hearing, the Board of Parole Hearings must "give great weight to the diminished culpability of youth as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law" (Pen. Code, § 4801, subd. (c); see *id.*, § 3046, subd. (c)), and we emphasize that neither the trial court's decision nor our affirmance of that decision should be interpreted as constraining or impinging on the parole board's independent decision-making authority.[6] (See Pen. Code, § 3041.5, subd. (c) ["The board shall conduct a parole hearing pursuant to this section as a de novo hearing."].)

## DISPOSITION

The judgment is AFFIRMED.

---

[6] Although Courts of Appeal have held eligibility for a youthful parole hearing renders moot a defendant's *Miller/Gutierrez* challenge to an LWOP sentence (*People v. Lozano* (2017) 16 Cal.App.5th 1286, 1292) the Attorney General has made no claim on appeal the instant challenge is moot. We therefore do not address the issue.

_____
Banke, J.

We concur:


_____
Margulies, Acting P.J.


_____
Bowen, J.*


**Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


A164100, People v. Rainey