Filed 6/26/26  P. v. Abram CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>KEVIN ABRAM,<br><br>        Defendant and Appellant. | A173088<br><br>(Marin County<br>Super. Ct. No. SC165001C) |

Defendant Kevin Abram, age 17 at the time of his offenses, was tried as an adult and found guilty of first degree murder (Pen. Code, § 187),[1] preventing a witness from testifying (§ 136.1), and criminal conspiracy (§ 182).  He was sentenced to a prison term of life without the possibility of parole (LWOP), plus one year for a firearm enhancement.  After two appeals, the trial court resentenced defendant in 2025 and reimposed an LWOP sentence, plus one year.  Defendant again appeals, arguing the sentence was an abuse of discretion.  We affirm.

**BACKGROUND**

**The Facts**

As summarized in our prior opinion in *People v. Blay* (Sept. 16, 2019,

---

[1]        Undesignated statutory references that follow are to the Penal Code.

A138380) (nonpub. opn.) (*Blay*), the facts underlying defendant's offenses are these:

"On September 13, 2008, [Tong Van] Le was killed in his car as it entered the garage of his Novato home. . . . [¶] . . . Le was killed at the direction of Larry Brian Blay, Jr. because Le was expected to testify against him.  Sean Demetrius Washington drove the vehicle that followed the victim driving home from the San Francisco market that Larry was accused of robbing.  Deandre Blay, Larry's brother, identified the victim ('There he is') getting into his car, and gave Washington the orders to follow and 'Don't lose him.'  Le had just opened his garage door, and driven his car into the garage, when [defendant] jumped out of Washington's car, ran into Le's garage, and fired a bullet into Le's face, while Le was still seated in his vehicle.  Deandre Blay then left the car, went into the garage, and returned with [defendant], who was carrying a gun.  When Washington inquired 'are there any bullets [left] in the gun?', [defendant] replied, 'No.' " (*Blay*, *supra*, A138380.)

Defendant was 17 years old at the time of the offenses.  (*Blay*, *supra*, A138380.)

**Procedural History**

In 2012, a jury convicted defendant of first degree murder (Pen. Code, § 187), preventing a witness from testifying (§ 136.1, subd. (c)), and two counts of conspiring with others to commit those crimes (§ 182).  The jury found true special circumstance allegations that defendant committed the murder both to prevent Le from testifying (§ 190.2, subd. (a)(10)), and while lying in wait (§ 190.2, subd. (a)(15)).  Firearm enhancements (§ 12022.2, subd. (a)(1)) as to each count were also found true.

In 2013, the trial court sentenced defendant to LWOP for the murder, plus one year for the firearm enhancement.  The court imposed, but stayed,

2

sentence on the other counts.

Defendant appealed. In 2019, we conditionally reversed the judgment and remanded the matter for a transfer hearing in light of Proposition 57.[2] (*Blay*, *supra*, A138380.)

In the event the juvenile court transferred the case to the criminal court, we directed that the judgment of conviction be reinstated, and that the criminal court then conduct a resentencing in accordance with the constitutional standards in *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*), as well as section 190.5, as construed in *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*). (*Blay*, *supra*, A138380.) As discussed in more detail below, under those authorities a trial court has discretion to sentence a 16- or 17-year-old juvenile convicted of special circumstance murder to LWOP or to 25 years to life, with no presumption in favor of LWOP. (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1379, 1390.) In *Blay*, we observed that when the trial court imposed the LWOP sentence, it "probably exercised its full discretion rather than applying" a presumption in favor of LWOP. But since we were remanding for other reasons, we directed that, should the case be transferred back to the criminal court, that court was to conduct a resentencing hearing so that it could affirm or change its sentencing choice of LWOP "explicitly on the record." (*Blay*, *supra*, A138380.)

On remand, the juvenile court conducted a transfer hearing and transferred the case to criminal court. Defendant appealed. In light of then recent legislative amendments that raised the prosecution's burden of proof

---

[2] Under Proposition 57, prosecutors who wish to try a juvenile as an adult must commence the action in juvenile court and move to transfer the matter to adult criminal court. (See *People v. Superior Court (Lara)* (2018) 4 Cal. 5th 299, 303–305.)

3

for transferring a juvenile to criminal court, in 2023 our colleagues in Division Three conditionally reversed the transfer order and remanded the matter for a new hearing. (*In re K.A.* (June 2, 2023, A166316) [nonpub. opn.].)

On remand, the juvenile court held a new transfer hearing and on May 15, 2024, ordered the case transferred back to the criminal court. Defendant's judgment of conviction was reinstated.

On February 27, 2025, the trial court resentenced defendant to LWOP, plus one year for the firearm enhancement.

This appeal followed.

## DISCUSSION

Defendant solely argues the trial court abused its discretion in resentencing him to LWOP for the murder, rather than 25 years to life. Despite the People's sentencing recommendation below, the Attorney General argues the court acted within its discretion when it reimposed an LWOP sentence. We agree with the Attorney General.

### The Law and Standard of Review

In *Miller, supra,* 567 U.S. 460, "the United States Supreme Court ruled that under the Eighth Amendment to the United States Constitution 'a state may authorize its courts to impose [a sentence of] life without parole on a juvenile homicide offender [only] when the penalty is discretionary and when the sentencing court's discretion is properly exercised. . . .' [Citation.] The proper exercise of discretion in this context requires the sentencing court to consider relevant evidence as may exist concerning factors that *Miller* identified as bearing on the 'distinctive attributes of youth' and how these attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders.'" (*In re Kirchner* (2017) 2 Cal.5th 1040,

4

1042, citing *Miller*, *supra*, 567 U.S. at p. 472 and *Gutierrez*, *supra*, 58 Cal.4th at pp. 1388–1390.) In other words, "a LWOP sentence for juveniles who committed a homicide offense is allowable only if the court considers the ' "mitigating qualities of youth" ' and limits 'this harshest possible penalty' to those 'rare juvenile offender[s] whose crime[s] reflect[ ] irreparable corruption.' " (*People v. Watson* (2017) 8 Cal.App.5th 496, 511–512, quoting *Miller*, *supra*, at pp. 476, 479–480, 489.)

In California, section 190.5 permits a trial court to sentence 16 and 17 year olds convicted of special circumstance murder to either LWOP or 25 years to life. (§ 190.5, subd. (b).) The California Supreme Court has held that, when properly construed, "section 190.5(b) confers discretion on the sentencing court to impose either [LWOP] or a term of 25 years to life on a 16- or 17-year-old juvenile convicted of special circumstance murder, with no presumption in favor of [LWOP]." (*Gutierrez*, *supra*, 58 Cal.4th at p. 1387.) Instead, the sentencing scheme "authorizes and indeed requires consideration of the distinctive attributes of youth highlighted in *Miller*." (*Gutierrez*, at p. 1361.)

Thus, in sentencing a minor to LWOP, trial courts must consider the following factors set forth in *Miller*: (1) "a juvenile offender's 'chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences' "; (2) " 'the family and home environment that surrounds [the juvenile]—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional' "; (3) " 'the circumstances of the homicide offense, including the extent of [the juvenile defendant's] participation in the conduct and the way familial and peer pressures may have affected him' "; (4) "whether the offender 'might have been charged and convicted of a lesser offense if not for incompetencies

5

associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys' "; and (5) " 'the possibility of rehabilitation.' " (*Gutierrez, supra,* 58 Cal.4th at pp. 1388–1389, citing *Miller, supra,* 567 U.S. at pp. 477–478.)

"To be sure," however, "[n]ot every factor will necessarily be relevant in every case." (*Gutierrez, supra,* 58 Cal.4th at p. 1390.) Further, a court imposing an LWOP sentence is not required to make a separate factual finding that the offender is permanently incorrigible, or to provide an on-the-record explanation with an implicit finding that the defendant is permanently incorrigible. (*Jones v. Mississippi* (2021) 593 U.S. 98, 101, 113.)

We review the court's sentencing decision for abuse of discretion. (See *People v. Watson, supra,* 8 Cal.App.5th at p. 514.) "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence . . . and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712, fns. omitted; accord, *People v. Cardenas* (2025) 18 Cal.5th 797, 812.)

"A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably infer from the evidence. (*People v. Edwards* (2013) 57 Cal.4th 658, 715.) We do not resolve credibility issues or evidentiary conflicts. (*People v. Zamudio* (2008) 43

6

Cal.4th 327, 357 (*Zamudio*).) "Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*Id.* at p. 358.)

**Additional Background**

Prior to resentencing on February 27, 2025, the parties submitted sentencing statements,[3] and the trial court held hearings where it heard arguments on the appropriate sentence. Both sides recommended a sentence of 25 years to life, rather than LWOP, plus one year for the firearm enhancement.

At a hearing on December 20, 2024, the court asked the prosecutor to explain the reasons for the People's recommendation of 25 years to life, given that they had previously recommended LWOP when defendant was originally sentenced. The prosecutor relied on the People's psychological expert, who had prepared a report in connection with the most recent transfer hearing and who, according to the prosecutor, "believes that [defendant] was capable of rehabilitation." Although the People opposed parole for defendant, the

---

[3] The People's sentencing statement was lodged under seal in this court and apparently also in the trial court. However, the record on appeal does not contain any sealing order by the trial court. (See Cal. Rules of Court, rule 2.551(a) ["A record must not be filed under seal without a court order"].) Further, this court has not been requested to, nor has it issued, any separate order to seal this record. (See *id.*, rule 8.46.) In any event, the parties have waived confidentiality as to the some of the contents of the People's sentencing statement because they freely referred to those contents in both the trial court and in their appellate briefs. Specifically, below the parties and the trial court referred to the reports of the parties' psychological experts filed in connection with the 2024 transfer proceedings before the juvenile court. The parties also do so in their appellate briefs, none of which has been filed under seal. We thus may refer to matters contained in the People's sentencing statement.

prosecutor stated: "the deciding factor was that, as troubling and as horrific as the underlying offense is, is it right and appropriate for us to overlook what a professional, who had the opportunity to interview him, says? And it's a fine line, your Honor, absolutely."

The court disagreed with the prosecutor's characterization of the expert's report, noting that the expert did not say "at all in the report" that "defendant is clearly on track for rehabilitation." The court went on to schedule another hearing so that it could have a "more robust discussion" with the parties regarding defendant's sentence. That hearing was held on February 14, 2025.

At resentencing on February 27, the court indicated it had reviewed the record, including the parties' resentencing brief, the expert reports submitted for the most recent transfer hearing, the juvenile court's transfer order of May 15, 2024, the briefs and transcripts from the original sentencing hearing, and the opinions in the prior appeals.

The court analyzed the factors in aggravation and mitigation set forth in section 190.3. It found that the circumstances of the crime were "really horrible" and involved "the execution of a witness to a crime to prevent them from testifying at trial;" that defendant's criminal history included "guns, robberies, and carjackings;" and that he was the actual killer of the victim. The court found that the aggravating circumstances outweighed those in mitigation.

The court then stated that pursuant to *Miller*, it had to consider "evidence relating to mitigating factors attributed to the age of the defendant at the time of the commission of the offense and the attributes attendant with youthful offenders and their lack of maturity and how those youthful attributes may have diminished the justification to impose an LWOP

8

sentence, which is the harshest penalty for people who are juveniles at the time of the commission of the offense." The court then analyzed the *Miller* factors at length.

For the first factor—the juvenile's age and its hallmark features, including immaturity, impetuosity, and failure to appreciate risks and consequences—the court noted that defendant was 17 years old at the time of the offenses, and thus was on the "older on the scale of minors" and "just about a year before being majority." By that time, "defendant had accumulated a very impressive juvenile record." In separate incidents while he was 13 years old, he "hit a female student and threatened to kill officers and students," shot paintball guns at passing cars, and drove a stolen car and crashed it into a light pole while recklessly evading police. At age 14, "he committed eight different robberies at gunpoint, carjacking at gunpoint, and assaulted . . . several victims, leaving one bleeding and unconscious with head wounds. A handgun was involved then as well." And at age 17, defendant committed a robbery with a gun and other crimes before the instant murder.

The court observed defendant had been given "extensive" rehabilitation opportunities before the murder. In 2004, he was in an intensive program that included anger management classes and "for a short time was doing well." But in 2005 and 2006, he "was exhibiting a lot of behavioral issues." Defendant refused various services, including mental health services, and absconded from one juvenile facility. In 2007, he appeared to be "on a positive path" when he was placed in a program for 20 months, during which time he "obtained a high school diploma, participated in classes and programs for anger management, peer relationships, gang involvement, substance abuse." But two days after leaving that program, "he began his

9

conspiracy with his codefendants to kill Mr. Le, and 24 days after leaving that program, Mr. Le was killed, shot at close range by the defendant in the head."

Turning to the second *Miller* factor, the juvenile's family and home environment, the court explained that defendant's "family life and upbringing was poor;" "[h]is childhood was fraught with problems;" he was exposed to violence and drugs early; and "started carrying a gun at ten years old when he started selling crack cocaine." Although his parents were not present or supportive, he had two grandmothers who appeared to have loved and cared for him and tried to help him, "but he was largely uncontrollable."

As to the third *Miller* factor, the circumstances of the offense, the court observed that the circumstances surrounding the murder were "horrible," with defendant and his codefendants killing the victim because the victim was going to testify against one of the codefendants. Defendant participated in planning the killing, armed himself, followed the victim from San Francisco to his home in Novato, and then shot the victim several times "at close range . . . in the head." The court expressed, "[I]t's hard to imagine a worst set of circumstances than this. . . . [T]his was a cold-blooded premeditated murder, and all because the victim had the nerve to be the victim of a crime in San Francisco and report it."

The court found no evidence that would suggest the fourth *Miller* factor—whether the defendant might have been charged with a lesser offense but for incompetencies associated with youth—applied. The court added that there also was "no evidence that the defendant was forced to commit the offense by any type of peer pressure, which he, when speaking to the psychiatrists or psychologists, confirmed."

The court turned to the fifth *Miller* factor, the possibility of

rehabilitation. It acknowledged that in the last five years while in prison, defendant had shown some positive conduct, including finding jobs. Yet, defendant's record in prison was not "stellar," as he had violations including for fighting, submitting a "dirty" urine test, refusing to take a urine test, tattooing a cellmate, disobeying a court order, and engaging in improper sexual activity with a visitor.

The court then pointed to the following opinions of the defense's and prosecutor's experts from the transfer hearing that caused the court "concern." The court explained: "Dr. Rokop, who was hired by the defense, had the following to say . . . . 'The current risk for future violence and criminality is moderate. The potential lethality of future violence is a concern, but his level of violence in prison has been minimal. Any rehabilitation efforts will need to be fairly intense to ensure the safety of the public.' " The court continued: "Dr. Carmichael, hired by the prosecution, . . . similarly came to the following conclusion: 'The defendant's risk for future violence and criminality is moderate. There is a higher risk for criminal behavior for longer periods of time even with targeted programming in place. People with the defendant's experiences often struggle to sustain gains from treatment programs. Heightened risk of future violence is present. The passage of time is not a proven safeguard that effectively reduces a person's risk of recidivism."

After going through the *Miller* factors, the court expressed that the fact that both sides were recommending 25 years to life and not LWOP "weighed very heavily on [it] in determining what to do here." Nonetheless, the court concluded: "if this case is not an LWOP case, what is? The defendant was 17 at the time. He had an extensive criminal record. The offense is very serious. He had exhaustive rehabilitative efforts. He murdered the victim in

cold blood with premeditation and lying in wait. I have tried to find a way to follow the guidance and recommendation of the parties here, but I simply cannot." Accordingly, the court reimposed a sentence of LWOP, plus one year.

## The Trial Court Did Not Abuse Its Discretion In Reimposing an LWOP Sentence

The argument section of defendant's opening brief is entitled, "Points and Authorities," and consists of two headings: (1) "The Sentencing Court Abused Its Discretion By Sentencing [Defendant] to Life Without the Possibility of Parole" and (2) "The Appropriate Sentence for [Defendant] Is Life With the Possibility of Parole."

Under the first heading, defendant contends that "[t]he sentencing court abused its discretion when determining whether there was information sufficient to modify the sentence to life with parole from life without parole." He points to this statement by the court at resentencing: "this court must decide if the LWOP plus one is and continues to be the appropriate sentence or if 25 years to life is a more appropriate sentence after considering all of the information." Defendant contends: "Based on this statement, the sentencing court presumed that the life without parole sentence originally imposed was the preferred sentence. This is in contradiction to the requirement of Penal Code Section 190.5(b) which, when properly construed, confers discretion on a trial court to sentence a 16- or 17-year-old juvenile convicted of special circumstance murder to life without parole or to 25 years to life, with no presumption in favor of life without parole. [Citation.] The failure to treat the two sentencing options as equivalent options was therefore an abuse of the trial court's discretion." (Emphasis omitted.) This argument lacks merit.

Defendant's interpretation of the court's statement is strained and unreasonable. When the court stated it must decide if the LWOP sentence "is

and continues to be the appropriate sentence," it was not suggesting any preference in favor of LWOP. Rather, a reasonable reading of that statement is that the court was merely referring to the fact that defendant had been originally sentenced to LWOP and explaining that it had to decide whether it should impose that same sentence again based on the information before it.

Indeed, the record as a whole reflects that the court understood and properly exercised its full discretion. The court and the parties specifically discussed *Gutierrez*'s holding that section 190.5 confers discretion on the sentencing court to impose either LWOP or a term of 25 years to life on a 16- or 17-year-old juvenile convicted of special circumstance murder, with no presumption in favor of LWOP. (*Gutierrez, supra*, 58 Cal.4th at p. 1387.) The court also recognized that under *Miller* it was required to consider "evidence relating to mitigating factors attributed to the age of the defendant at the time of the commission of the offense and the attributes attendant with youthful offenders and their lack of maturity and how those youthful attributes may have diminished the justification to impose an LWOP sentence, which is the harshest penalty for people who are juveniles at the time of the commission of the offense." The court proceeded to thoughtfully and thoroughly analyze the *Miller* factors, make factual findings, and explain its reasoning. Thus, as the Attorney General observes, "the record makes clear the court properly understood its discretion."

The remainder of defendant's arguments under the first heading of the argument section of his opening brief overlaps with his arguments under the second heading. Those arguments effectively assert the same thing, which is that "the appropriate sentence for [him] was life with the possibility of parole." This position is described in various ways throughout his briefing, exemplified by this description in his reply brief: "[Defendant] is capable of

13

rehabilitation. Therefore, the Trial Court erred in sentencing [him] to life in prison without the possibility of parole."

Although not entirely clear, defendant seems to argue that the evidence was insufficient to support his LWOP sentence because the evidence demonstrates he was "capable of rehabilitation" and thus "worthy" of a sentence of life with the possibility of parole. In claimed support, defendant relies on: (1) the People's recommendation of a sentence of 25 years to life, plus one year; (2) certain statements of the juvenile court in its May 15, 2024 transfer order; and (3) purported evidence of "his good conduct while incarcerated and his continued progress towards rehabilitation."

As an initial matter, we note that defendant's argument focuses solely on the fifth *Miller* factor—the possibility of rehabilitation—and thus eschews any discussion of the other four factors. As detailed above, the trial court analyzed each of the *Miller* factors. By failing to address the trial court's analysis of the first four *Miller* factors, defendant effectively concedes the correctness of that analysis. (See *Westside Center Associates v. Safeway Stores 23, Inc.* (1996) 42 Cal.App.4th 507, 529 [party "effectively concedes" issue by failing to address it in brief]; *Glendale Redevelopment Agency v. Parks* (1993) 18 Cal.App.4th 1409, 1424 [parties "impliedly concede" an issue by failing to address it].)

As another initial matter, to the extent defendant is attempting to challenge the sufficiency of the evidence supporting the trial court's factual findings, the claim is forfeited because he fails to set forth a complete summary of the evidence material to the issue. " ' "[A] reviewing court must presume that the record contains evidence to support every finding of fact, and an appellant who contends that some particular finding is not supported is required to set forth in his brief a summary of the material evidence upon

14

that issue.  Unless this is done, the error assigned is deemed to be waived." ' " (*People v. Dougherty* (1982) 138 Cal.App.3d 278, 282, quoting *In re Marriage of Fink* (1978) 25 Cal.3d 877, 887–888.)

Forfeiture aside, defendant's argument fails.  To begin with, he fails to provide any evidence to support the factual premise of his argument:  he was capable of rehabilitation.  As noted above, defendant relies in part on the fact that at resentencing, the People recommended a sentence of one year plus 25 years to life, instead of one year plus LWOP—a change from their recommendation at the original sentencing.  Defendant asserts, "the Marin County District Attorney recognized that [he] was capable of some form of redemption and, given his juvenile status at the time of the offense, was worthy of the opportunity of parole eligibility."  Defendant treats the prosecutor's argument about his "capabil[ity] of . . . redemption" as evidence of that purported fact.  However, "[a]rgument by counsel is not evidence" (*Villacorta v. Cemex Cement, Inc.* (2013) 221 Cal.App.4th 1425, 1433) and for that reason, an appellate court will "not consider counsel's argument in determining whether there is substantial evidence to support" a trial court's finding.  (*Ibid.*)

As another basis of his claimed capability of rehabilitation, defendant points to the following statements of the juvenile court in its May 15, 2024 transfer order:  "It is respectfully suggested that [defendant's] rehabilitation lies in the direction of a system that can provide appropriate programing, housing, vocational training and close monitoring and consequences that will forever break the cycle that [defendant] has lived and from which he can materially benefit.  That path will materially benefit [defendant], give him an opportunity to live a sustained, law-abiding life, and provide the public with the safety it requires and the benefit that a rehabilitated [defendant] has to

15

offer." This statement, defendant contends, "indicates a realistic path for [his] rehabilitation" and "shows that the court did not believe [him] to be incorrigible." Defendant's reliance on the juvenile court's transfer order is misplaced. That the juvenile recognized a "path" for defendant's rehabilitation did not necessarily mean that it also found him amenable to any such rehabilitation. In fact, in deciding to transfer the case to the criminal court, the juvenile court concluded that defendant was *not* amenable to rehabilitation.

This leaves us with defendant's bare assertions peppered throughout his briefing such as: "The decade plus years that have passed since the homicide occurred have shown that [he] is capable of following his current arc towards rehabilitation;" he is "worthy of an opportunity to become eligible for parole based on his good conduct while incarcerated and his continued progress towards rehabilitation;" and his "progress and movement towards rehabilitation in the years since his original conviction strongly indicate that he is worthy of a life with the possibility of parole sentence." In the first place, defendant has forfeited these contentions because he fails to support them with citations to the record and cogent legal analysis. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 [" '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' "]; *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277 ["By failing to provide adequate record citations or make any cognizable claims of error . . . , appellants have waived [their] challenge [on appeal]"].) But even if not forfeited, defendant's claim is unavailing.

In focusing on purported evidence of "his good conduct while

incarcerated," defendant essentially asks us to reweigh the evidence, draw inferences contrary to those the trial court drew, and substitute a factual finding favorable to him with the adverse finding the trial court made. In doing so, defendant misconstrues the substantial evidence test. In reviewing a trial court's factual finding, we do not determine whether substantial evidence might support the appealing party's version of events, but rather whether substantial evidence supports the trial court's factual finding. (*Zamudio*, *supra*, 43 Cal.4th at p. 358.) Here, there was such evidence.

The trial court was required to, and did, "consider any evidence or other information in the record bearing on 'the possibility of rehabilitation,' " and, as relevant to that question, "[t]he extent or absence of 'past criminal history.' " (*Gutierrez*, *supra*, 58 Cal.4th at p. 1389, citing *Miller*, *supra*, 567 U.S. at pp. 478, 479.) We infer from the court's comments and ruling at resentencing that it impliedly found the possibility of rehabilitation was low. The record, as recounted by the court, contains substantial evidence to support that implied finding.

The court found that prior to committing the murder, "defendant had accumulated a very impressive juvenile record," which included several incidents involving assault, criminal threats, and multiple robberies at gunpoint. The court noted there were "exhaustive rehabilitative efforts" that were unsuccessful. Although defendant had shown some progress in one program, "24 days after leaving that program, [the victim in this case] was killed, shot at close range by the defendant in the head."

The court also considered defendant's conduct while in prison during the five years prior to resentencing. Although defendant showed some positive conduct such as finding jobs, he also committed numerous rule violations including for fighting, submitting a dirty urine test, refusing to

17

take a urine test, tattooing a cellmate without authority, disobeying a direct order, and engaging in improper sexual activity with a visitor.

In addition, the court noted that both parties' psychological experts provided "concern[ing]" opinions about the possibility of rehabilitation. As the court noted, according to the defense expert, " 'The current risk for future violence and criminality is moderate. The potential lethality of future violence is a concern, but his level of violence in prison has been minimal. Any rehabilitation efforts will need to be fairly intense to ensure the safety of the public.' " And the prosecution's expert opined: " 'The defendant's risk for future violence and criminality is moderate. There is a higher risk for criminal behavior for longer periods of time even with targeted programming in place. People with the defendant's experiences often struggle to sustain gains from treatment programs. Heightened risk of future violence is present. The passage of time is not a proven safeguard that effectively reduces a person's risk of recidivism.' "

In sum, there was substantial evidence from which the court could reasonably find, as it impliedly did, that the possibility of rehabilitation was low. Consequently, defendant has failed to establish the factual premise of his argument that he was capable of rehabilitation.

Moreover, as noted above, defendant does not challenge the court's analysis of the other *Miller* factors. And in any event, we see no abuse of discretion in the court's analysis of those other factors, or in its overall weighing of all of the factors to conclude that an LWOP sentence was warranted. In imposing an LWOP sentence, the court found, in addition to the unlikelihood of rehabilitation, that defendant was only one year shy of 18 years old when he committed the murder; had accumulated an extensive criminal history by the time of the murder, including eight different robberies

18

at gunpoint and violent assault of several victims; the circumstances of the murder were "horrible," with defendant "participat[ing] in the planning leading up to the killing," arming himself, and following the victim, and shooting him several times "in the head at close range;" and there was no evidence defendant committed the murder due to peer pressure. Given these findings, the court could reasonably conclude that defendant was a " 'rare juvenile offender whose crime reflect[ed] irreparable corruption.' " (*Miller*, *supra*, 567 U.S. at pp. 479–480.)

Accordingly, the court did not abuse its discretion in reimposing a sentence of LWOP plus one year.

**DISPOSITION**

The judgment is affirmed.

_____

RICHMAN, J.

We concur.

_____

STEWART,  P. J.

_____

MILLER, J.

(A173088N)